District, Mr. Nichols, you're up first, I believe. Good morning and may it please the Court. This second appeal from the proceedings before the District Court presents an important question. Could the District Court properly award fees to Mr. Monroe incurred over the life of the case when the only success obtained by Mr. Monroe was with respect to a claim that arose, was eventually raised, and remained ripe only for a limited period of time in the middle of the litigation? Now the importance of this question is self-evident. At issue is the need to guard against a situation in which success in civil rights litigation, no matter how limited in the overall context and timeline of the case, generates fee recoveries that far exceed that success at the expense of public institutions and the taxpayers who support them. This Court and the Supreme Court have recognized the importance of the safeguard of matching fees with limited success many times, including in Hensley from the Supreme Court in the cases that followed, and this Court's most recent case following Hensley in Fessler, which was issued earlier this year, and we respectfully contend that this line of authority answers the important question that is before this Court on this appeal. I know this is a practical Court, and I know I'm appearing before three practical members of this Court, so talking practicalities without having to put on, in the parlance of the attorney's fee cases, a green eye shade, how does this Court know that the fee award in this case far exceeds the success obtained in the case? You urge, if I understand it, that anything that preceded the amended complaint, the second amended complaint, is excludable. Yes, sir, and that is the exact point that Judge Stewart, which is this is not a green eye shade type exercise of parsing individual entries for what is reasonable or what is recoverable or non-recoverable. It just requires looking at the timeline, and the timeline actually implicated, interestingly, I've never been in an attorney's fee case before, that actually implicates proceedings that occurred before this Court, because if you all remember, this case first came up to this Court on an appeal from the denial of a preliminary injunction that concerned what I'll call Claim 1, for purposes of the argument. And Claim 1, as the Court is well aware, was the claim that arose with respect to the criminal trespass warning. That was Claim 1. Claim 2 is the claim that related to the issuance of a letter dated July 15, 2019 by an HISD administrator that, if the Court will recall, was attempted to be raised in the context of that first appeal, and this Court, in its opinion, unequivocally said that claim is nowhere in the complaint, which makes the point. There is Claim 1 and Claim 2, and Judge Stewart, you're absolutely right. Our position is that Claim 2 was only raised as of the filing of the Second Amendment complaint on November 26, 2019. And so . . . You mentioned practicality. You know, things don't happen in a vacuum, as you well know. So there's a certain inertia about this whole case, you know, to get to certain points and so on and so forth. So I get your argument as if there's sort of like just a clean starting point, but what possibility, if at all, do you allow that there is a core set of actions, et cetera, in all that preceded that necessarily, as a lawyer, are inextricably tied to whatever point you say, you know, the compensation, or said differently? I mean, how can we look at it as just completely, you know, there's this line between everything that doesn't count and only that which counts? Same lawyers, same case, back and forth before the district, you know, on and on, the existence of the injunction and so forth. So, you say no fees as part of that are compensable at all, or the district court exceeded at best what could be allowed, or is yours just an all or nothing kind of argument? No, there is a, obviously there's a zone in which a district court can exercise discretion. And here, my answer to you, Judge Stewart, would be it would be proper for a court to exercise discretion around that time period in which that claim was actually raised. But our respectful position is that it was an abuse of discretion to go back to the inception of the lawsuit before this claim ever arose and include fees. And there's a chart that is on page 20 of our appellant's brief. And that chart categorizes the fees in three categories that illustrate the issue. Because, Judge Stewart, over 172,000 of the 299,200 fee award was incurred during a time period between the original filing of the lawsuit, claim one, and the filing of that second admitted complaint on November 26 of 2019. So, Judge, practicalities, 100%. Is there some room in which the court could exercise discretion with respect to that $111,000 that were incurred from that point forward? Absolutely. But the point is that, as in Hensley, in which the Supreme Court said that they were impressed with the district court's effort to justify the fee award, but they nonetheless remanded the case because it was clear to the Supreme Court that the district court had not adequately addressed the issue of limited success based on claims that ultimately succeeded, that had success on, versus those that didn't. And the other way this is illustrated, not only just through the first appeal to this court, but on the, when this court remanded the case back to the district court, the district court had another preliminary injunction hearing. And the issues that were framed for that second preliminary injunction hearing were issues over the HISD Administrator's Letter Claim 2. But when we got to the hearing, and you can see it from the court's order after the second preliminary injunction hearing, the court, the district court itself very deliberately laid out the issue on the Criminal Trespass Warning as to which it maintained its ruling, that there was no relief granted on that claim, Claim 1, and then Claim 2, where the preliminary injunction was entered. So it's clear from the record that, as the court said, at the conclusion of the final trial in the case, which of course was a situation where the plaintiff in essence abandoned all claims relating to Claim 1, and just Claim 2 was tried, the district court concluded and the appellee indicates on page 33 of the appellee's brief that the March 10, 2021 letter mooted, the language is unambiguously retracted, vacated, and nullified the letter that was the subject of Claim 2. So under this timeline, Judge, sure, there's some working around the edges that a court could logically exercise some discretion under, but our respectful position... The retraction from the position it had held is in no way connected to the work product of the lawyers? I mean, HSD didn't just do it, huh? No, and that's why I think that we're not claiming, and I don't know if there's been arguments made that we're claiming that there's been no level of success in the case, and that's not our claim. No, no, no, I'm not trying to put words in your mouth. No, no, no, no, but that's not our, but you understand, that's not our position. Our position is that you've got to correlate the success to the fees that are awarded, and respectfully in this case, that didn't happen. Frankly, we thought it would happen, because at the conclusion of the final trial of the case, over claim two, the court indicated, and it's in our brief, we've cited it, the court indicated, and I'm quoting from the court's language, that the shape of the case changed with the filing of the second amended complaint. Those are the district court's words. So, in other words, the complaint that added this claim upon which the plaintiff achieved some type of success occurred with that final litigation, and our respectful position is that that, the cap at the end of that is the March 10th, 2021 letter, which everyone acknowledges, even the appellee in its brief acknowledged, made that claim moot. And so ... A different question, not to throw you off, but so I won't forget. The district court discerned, I think, what, the $500 an hour was sort of the rate for Houston, et cetera. HISD also contests the hourly rate. Did you differ in terms of the district court's discernment of the experience, et cetera, et cetera, of opposing counsel, all that went into this, and so on. So putting aside for the moment, what's compensable? Why is the dollar amount, I mean, the $500 versus the $350, I know you say to your side represents a public entity, and I get all that, but on the other hand, in the spirit of the Act, a private plaintiff not represented, why would he be held to what the public entity might be charged in this case, given, you know, a lot of pushback back and forth, you know, in this case? So we did raise an issue before the district court about rates, and it was made public that the rates that we charge, because it is a public entity, was in the order of $350 an hour, but that is not, Judge Stewart, that's not, I know it's been raised in some of the briefing, but that has not been framed by HISD's position on appeal. In other words, this is all about, we're not putting on the green eye shade, we're not asking anybody to do that, this is strictly following Hensley and the cases that followed Hensley in saying that a district court, such as the district court here that we all respect so much, has to analyze when you have a case that involves one claim in which, or one or more claim in which the plaintiff has success, and one or more claim in which the plaintiff doesn't, there has to be a consideration of that under Hensley, and the Fessler case is a great example of that from earlier this year from this court. If the court recalls, not equivalent facts involves a toilet tax on a product's liability class action, but the issue that the court grappled with there was, if a doesn't succeed on others, isn't there a need for the district court to analyze how to correlate those fees according to the degree of success? And that . . . You're asking the panel to say, A, the district court abuses much discretion in terms of what's compensable, but it also abuses discretion by allowing the $500 per hour rate? No sir. Our specific ask of the court is to, for this court . . . What's compensable? To remand the case to the district court and ask the district court to reconsider its award of fees in light of the timing and context and extent of success that was achieved on claim two versus claim one. The question of the degree of success achieved or obtained, does that reduce down to a factual question? Not the way that the cases have held, because if it was always a factual question, then you would never have a case like Hensley. You'd never have a case like Fessler, which obviously sent, remanded the case back to the district court for redetermination. There is a, as Judge Stewart was saying earlier, there's obviously got to be an area in which factual, it's going to be a fact-intensive inquiry. Like if we look at a particular entry on an invoice and say, you know, was this invoice, was this time reasonable in light of the context of the case? That's not this case whatsoever. You've got invoices that are part of the record, and they're in the record at 1165 to 1181, and those bills unequivocally include descriptions that relate to claim one that have nothing to do with claim two. Plaintiff, civil rights plaintiff, includes sort of a catch-all damages claim, but really the paramount focus of their litigation is seeking injunctive relief. That is kind of what they're focused on. They're locked on it. But they do ask for damages, but does it matter how vigorously the plaintiff pursues the damages claim, or is it enough to simply ask for damages in the complaint and then not receive them, and then you can't get full attorney's fees? Right. I mean, I understand your question, because there are that line of cases that talk about if someone does seek damages, then you would look at the delta between what they asked for versus what they were awarded and use that as a measuring stick. But as you point out, Judge Willett, the damage claims were abandoned. That's important in terms of the context of the overall success in the case, but the more simple, practical, non-eye-shade-wearing reality is that there were two claims on which injunctive relief was sought, and they're very different from each other. The injunctive relief sought on claim one was with respect to a criminal trespass warning that would have excluded Mr. Monroe, or did exclude Mr. Monroe, from coming on to any HISD facilities for a prescribed period of time. Claim two, the injunctive relief was with respect to what the Court will remember from the first appeal as being the, quote, bespoke speech policy, which was not an issue of whether or not he could come on to HISD facilities, but rather whether the July 15, 2019 letter actually created policy, which, of course, HISD contended it didn't. But that's the very separate claim, because any injunctive relief issued on claim two would not be limited to that time period of the criminal trespass warning. And I see my time for primary argument has expired. All right, thank you for your responses, and you've reserved your rebuttal time. Thank you. All right, Mr. Nichols. I'm sorry, Mr. Newar. May it please the Court. Your Honor, Scott Newar for the appellee, Jerry Monroe. My good friend and colleague, Mr. Nichols, just told the Court that this Court is not to play green eyeshade accountant. It's not to micromanage the trial court. Under the precedence of the Court, of the United States Supreme Court in Fox v. Vice and this Court in numerous opinions, that is exactly what this Court is not supposed to do. But that's exactly what he wants the Court to do. He says, and if I understand his argument, the core of what he's saying is this Court should divorce the work we did on claim one because we didn't prevail on a part of the lawsuit, which was the criminal trespass ban, the indefinite criminal trespass ban. And by the way, Your Honor, I know Judge Willett and Judge Oldham have the benefit of the prior argument, but the criminal trespass ban originally was indefinite. And when we filed a lawsuit, we were seeking to remove that indefinite. They banned Mr. Monroe indefinitely from all HISD campuses and activities subject to a criminal trespass if he came on the property. What happened was we filed a lawsuit, and then on the day before the first preliminary injunction hearing, HISD removed the indefinite portion of that ban, and they limited it to six months. They reduced it to December 31st of 2019 from indefinite, and they also rescinded their prescription on Mr. Monroe coming onto the campus. They said he could now come onto the campus at any time except for board meetings subject to prior approval. The point is, Your Honors, you cannot divorce claim one from claim two. They all arise out of a common core of facts and related legal theories, which is the standard that the United States Supreme Court in Fox said. It's actually a lesser standard in Fox. It's whether the time expended on unsuccessful claims was reasonably incurred. Now Fessler, out of this Court, subsequent to Fox, says it's a question of whether the facts arise out of the work on the unsuccessful claim arises out of a common core of facts and related legal theories. All of this arises out of the April 11th trespass ban. There's just no dispute about that. The beginning of this case is the April 11th, 2019 letter that was then modified by the July 10th, 2019 letter. So even if we assume arguendo that they're correct, that we didn't prevail on a claim or claims, we don't have to. All we have to do is show that the unsuccessful claims arise out of a common core of facts and related legal theories. We clearly did that, and Judge Warline found as much. So with respect, with due respect, we've met the Fessler standard, we've met the Fox v. standard for getting the award that Judge Warline awarded. Now what Mr. Nichols also doesn't tell the Court is the standard of review is not just, you know, is it in the area, whatever. It's substantial deference to Judge Warline's view. He had two and a half years of litigation in this case. He presided over three trials, essentially, the first preliminary injunction hearing on December the 10th of 2019, and a trial on the merits in July of 2021. He also had extensive summary judgment briefing before the trial on the merits. Judge Warline was intimately familiar with the work that was done here and what transpired, and you can see in his opinion, he's deeply upset. He gave HISD extensive rope to try to get this case resolved over two and a half years. He encouraged them. The reason that they partly came in with the July 10th modification is because Judge Warline told them in camera, your indefinite ban will not pass constitutional muster. He was trying to get this case resolved. They kept moving the goalposts, and they kept trying to play games to try to moot the case. And that's why Judge Warline says in his opinion in a couple of different places, his attorney's more than their fair share to the messiness of this litigation, and their shifting litigation tactics are responsible for why the fees became what they are. Now, he wants this court to be practical. Well, we have barometers in this court for fees. In the De Leon case, which I cited in my Rule 28J letter, there were eight attorneys, and that was also a constitutional case, a same-sex marriage ban case. Eight attorneys spent 1,700 hours over two years on that litigation. We spent less than 600 hours, two attorneys spent less than 600 hours, which is what Judge Warline awarded us, he awarded us 572 hours, for two and a half years of litigation. We were extremely efficient here. We did not try to churn fees. He cites you to the Fessler case. The Fessler case is completely distinguishable. It's a class action case, as he said, on products liability. It involved damages. Judge Willett, you're absolutely correct. Our goal here wasn't to win damages. We weren't seeking money from Mr. Monroe. This was a true First Amendment case from beginning to end. We wanted an injunction, and we wanted a declaration that HISD had violated the First Amendment and the Fourteenth Amendment through the Void for Vagueness doctrine. We got that. We got that. And the reason that, you know, it's not a question of balancing of equities. We satisfied the Dearmore standard that Judge Warline set for preliminary injunctions. We got a determination that HISD's conduct, excuse me, was, we were substantially likely to prevail on the merits of the claim that their conduct violated the First and Fourteenth Amendments. Judge Stewart, you asked about the hourly rate. They did challenge the hourly rate below. They tried desperately to get us to, to get Judge Warline to award us between $225 an hour and $350 an hour, even though Mr. Nichols and his co-counsel are charging far in excess of that. They argued, well, we're a public entity. That's not a factor in this Court's analysis. It's the prevailing market rate in the community of lawyers. And there are numerous cases, including in the De Leon case, in which $400 an hour was awarded in 2017 for work that was performed in 2013 and 2015. There's also the Worrell case out of 2008 in which this Court affirmed a $500 an hour award for lawyers. So they did challenge it. They have abandoned it in this Court. But they're still challenging the hours. And I come back, Your Honors, to the hours. When you look at what we did, less than 600 hours over two and a half years of litigation, that compares extremely favorably to De Leon. And also, a case we cite in our brief, a Northern District of Texas case, the Millennium case, in which it was a true First Amendment case. The lawyer spent 570 hours in one year of litigation. Well, respond directly to Counsel Opps' argument. You heard my question to him. You know, in terms of the first appeal up to this Court, goes back down. You know, his argument, if I understand it right, you know, basically, the Second Amendment complaint sort of, you know, reshapes the dynamic, so to speak. And my question to him is, well, you know, is it really just such a clean cut? But I ask you, equally, yes, some energy of the initial litigation is part and parcel. But like you all add, they're at $29,000 and the District Court awarded $299,000. That's a huge gulf. Otherwise, I would have sent you all to our court mediator to work it out. But I mean, that's a huge gulf. But my question we're in is, do you allow for the possibility that, yes, there may be some part of that that is inextricably tied, but does, in fact, the Second Amendment complaint reshape the dynamic to where all of it isn't compensable? Judge Stewart, I appreciate your question. The answer, though, is the following. The only reason the Second Amendment complaint came in was because we had this remand from the first panel in which the panel said, you need, Judge Werlein, you need to take a look again at this July 10th letter. In fact, we had raised that below, but it had not been raised in the form of an amended motion for preliminary injunction. But so the answer is, Your Honor, the Second Amendment complaint, it wasn't like this was a whole new litigation in the Second Amendment complaint. This was all based on what had happened out of April the 11th of 2019 at that board meeting. HISD just came in on July the 10th and modified the ban to impose this gag rule on Mr. Monroe. There had not been a gag rule on what he could say before the July 10th ban. So they added that with what they gave with one hand, meaning they reduced the length of the time from indefinite ban to six months. And then with the other, they tried to gag him. They tried to say, okay, we're going to let you come on to the board meetings, but you are not going to say anything derogatory or offensive or name-calling about our board members. So that was the little game that they played with Mr. Monroe and with the First Amendment. They were trying to silence him from saying anything critical. So my point, Your Honor, is you can't look at this in isolation, which is what Mr. Nichols and HISD want the court to do. It's a continuum of activity that implicated the First Amendment. We prevailed by getting a declaration that that gamesmanship was unconstitutional. The attempt to silence Mr. Monroe was unconstitutional. That is the reason we were awarded that award. And Mr. Nichols knows, and I think this Court knows, Judge Warline is no plaintiff's judge. His reputation in the Southern District and throughout the state of Texas and the Fifth Everyone knows Judge Warline is extremely, extremely judicious, fair to both sides. He had enough of what happened here, and that's why he awarded the fee he awarded. So I say to the Court, Your Honors, again, this is a substantial deference case. There cannot be micromanagement. This Court should not be playing green eyeshade accountant, which is what Mr. Nichols says it should do. He says, yes, there's an area where these fees are legitimate. But he wants this Court to go into the area and begin to line out what should and should not be considered acceptable. That's not the role of this Court. That's not the role. That was the role of Judge Warline. And he says in his opinion, I went through a line, a detailed line-by-line review of the fee application, and I considered it all. And he also said that we exercised billing judgment, which we did. So with that, Your Honors, I yield my time, unless there are any questions. All right, back to you, Mr. Nichols. Thank you, Your Honor. Just a few gentle corrections to the record. I think it was said that there was never any claim for damage. I think, Judge Willett, you were asking your question because you know that there was a claim for damage that was abandoned at some point during the case. There was an argument that somehow our rates were over $350,000. I think the Court knows, as I told you, Judge Stewart, that the rate was $350,000. That's an authorized law firm government rate that was charged. Are we no longer challenging the $500,000? No. That's not, as I said before, that's not a part of the appeal. And then with respect to the idea that Claim 2 was always in the case, I would direct the Court specifically to the Second Amendment complaint, paragraphs 25 through 28, which explicitly, if you compare the First Amendment complaint to the Second Amendment complaint consistent with this panel's, or with another panel's order in the first, that claim was added. There's no doubt about that. And in terms of the argument about gamesmanship, the reason why I'm not presenting you all again with the extremely painful record of what brought us all here is because all the claims concerning what happened at that April 9th meeting involving those HISD administrators and what happened at that HISD board meeting, they abandoned those claims for good reason. I wouldn't want to put those, that fact situation in front of a jury either. But to suggest that somehow HISD is somehow responsible for getting us to where we are, I think is respectfully putting the, putting the mantle on the wrong party. Now interestingly, in the argument, there was a, there's actually a reference again to the fact that, I think I wrote this down correctly, that HISD, quote, added a gag order. Well, that's the point that we keep coming to. The addition of an additional set of facts that gave rise to Claim 2 is the basis of the argument that we're presenting to the Court, and of course we all have the utmost respect for the District Court, but as in Hensley, there's a need to actually go through and analyze. In this case, the plaintiffs asked for $375,400 in fees. The Court awarded $299,200. Simple math, that's 80% of all of the fees that were asked for were awarded by the District Court. Does 80% of the total fee incurred correlate to the degree of success obtained in the litigation? You don't need a green eye shade to know that it doesn't, and there's a, there's a need for the District Court to go back and look at the issue of, you know, how do you fashion, as you were attempting to do, Judge Stewart, very carefully, how do you fashion something around the time period when the Claim 2 was pending? Do you need to add a little bit because, as you said, you know, you start the case at some point and the case involves similar parties, involves the same lawyers? Hensley says, of course you can look at that, but under Hensley, it says very clearly, if you're bringing separate claims against the same institution, you can't just say, okay, if you're bringing claims against the same institution, then inevitably it's going to be inextricably intertwined. It's not. And with respect to the claims that are pending here, there is a very ready path towards dividing fees that correlate to success and those that don't, and we respectfully request that this Court make further determinations along those lines. Do you have any comment on his 28J case? Your Honor, I don't know how the Court feels about 28J practice. I mean, he added a case from 2017 that I'm not sure I would file a 28J to raise a case that I could have raised in my brief, but that case doesn't really provide any additional support to the position they're taking in the case. So, of course, Fessler was a class action. Is it helpful or not? I mean, I know, and you know what it says, but it's a class action. Is that enough of an analog to be helpful, or we're just back in the core of your arguments? No. So that's why I mentioned Hensley, because Hensley's obviously, as you know, Judge, was a 1988B recovery for attorneys' fees, civil rights recovery. But, as you also know, the cases, even if a statutory right to attorneys' fees as a prevailing party arises under different statutes, the courts have consistently applied the same level of analysis. It's the same thing in any of the other cases that have been cited to the Court, whether it's the Migas v. Pearl Vision case. That was an employment discrimination case, as you recall, Judge, so same analysis there. The Fox v. Vice case that parties have cited, that relates to the award of fees actually to a defendant. And so the same principles about correlating success to the amount of fees awarded and the need for a district court to do that very carefully, very thoroughly, apply across the entire spectrum of cases in which attorneys' fees are authorized. One last copyright question. You've asked for a remand. Are you contemplating a remand with instructions for the district court to do something, or are you contemplating a remand for another hearing with more litigation, which just makes me think about more attorneys' fees being generated? Practically speaking, Judge, if I believe, and it's consistent with what you said about a mediation program, I believe that if this Court sends the right message about the need to segregate fees between those that are recoverable and those that are not because they correlate to success, I doubt seriously that we will ever get back to a contested issue in the case. Okay. I was just a curiosity question. Yes, sir. I didn't want to put you on the spot or anything, but I was thinking about more hours generated in the district court litigating it. Understood. And I very much appreciate the Court's time, and it's great to be back before the Court after the— All right. Thank you, Mr. Nichols, and thank you, Ms. Newar. We appreciate your briefing and argument. We know it's an important case, and we'll take it under submission and give it our best shot. All righty. Okay.